# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **TONYA O. VICTOR** | **CIVIL ACTION** |
| **VERSUS** | **NO. 21-484** |
| **WARDEN FREDERICK M. BOUTTE** | **SECTION: "I"(3)** |

## REPORT AND RECOMMENDATION

Petitioner, Tonya O. Victor, a Louisiana state prisoner, filed this federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254. For the following reasons, it is recommended that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner and her husband, Errol Victor, Sr., were charged under Louisiana law with second degree murder while engaged in the perpetration of the crime of cruelty to a juvenile. At trial, the jury unanimously found her guilty of manslaughter.[1] On September 15, 2014, she was sentenced to a term of twenty-one years imprisonment without benefit of probation or suspension of sentence.[2] On May 26, 2016, the Louisiana Fifth Circuit Court of Appeal affirmed her conviction and sentence.[3] On October 15, 2018, the Louisiana Supreme Court then denied her related writ application.[4]

---

[1] State Rec., Vol. 20 of 20, trial transcript, p. 4,922; State Rec., Vol. 1 of 20, minute entry dated August 1, 2014. At that same trial, Mr. Victor was found guilty as charged of second degree murder. However, his verdict was **non-unanimous** and, as a result, it was subsequently vacated for further consideration in light of Ramos v. Louisiana, 140 S. Ct. 1390 (2020). Victor v. Louisiana, 140 S. Ct. 2715 (2020); see also Victor v. Robinson, Civ. Action No. 20-3194, 2021 WL 2482520 (E.D. La. May 28, 2021), adopted, 2021 WL 2477257 (E.D. La. June 17, 2021). He is currently awaiting retrial.

[2] State Rec., Vol. 20 of 20, transcript of September 15, 2014; State Rec., Vol. 1 of 20, minute entry dated September 15, 2014.

[3] State v. Otkins-Victor, 193 So. 3d 479 (La. App. 5th Cir. 2016).

[4] State ex rel. Otkins-Victor v. State, 253 So. 3d 1294 (La. 2018).

On March 3, 2021, petitioner filed the instant federal application seeking habeas corpus relief.[5]  The state filed an answer arguing, *inter alia*, that the application is untimely.[6]  At petitioner's request, the Court granted her an extension of time until November 5, 2021, to file a reply to the state's answer.[7]  However, ultimately, she opted not to file a reply; she instead filed a motion asking that this Court stay these federal proceedings to allow her an opportunity to file an application for post-conviction relief in the state courts.[8]

In Rhines v. Weber, 544 U.S. 269 (2005), the United States Supreme Court held that a federal district court may, when appropriate, stay habeas corpus proceedings.  Nevertheless, courts must be mindful that "[s]taying a federal habeas petition frustrates AEDPA's objective of encouraging finality by allowing a petitioner to delay the resolution of the federal proceedings." Id. at 277.  Therefore, "stay and abeyance should be available **only in limited circumstances**." Id. (emphasis added).  Courts have found that a stay is not appropriate if the federal application at issue is **untimely**.  See Beane v. Quarterman, No. 3:09-CV-0940, 2009 WL 2252060, at *3 (N.D. Tex. July 27, 2009) ("A stay is simply not warranted when a petitioner has filed an untimely federal protective writ.  A requested stay will not change the timeliness of the filed protective petition."); see also Smallwood v. Cain, Civ. Action No. 12-2812, 2013 WL 5757663, at * 6 (E.D. La. Oct. 23, 2013) ("A stay would be unnecessary and unduly burdensome on the Court and the respondent where the underlying petition is already untimely and any delay in his return would not cure that concern."); Nellon v. Cain, Civ. Action No. 10-4430, 2012 WL 1142539, at *3 (E.D. La. Jan. 25, 2012) ("[I]f petitioner's protective federal application was already untimely when filed, a stay is not warranted."), adopted, 2012 WL 1089232 (E.D. La. Mar. 30, 2012); Madden v. Thaler, No.

---

[5] Rec. Doc. 5.
[6] Rec. Doc. 14.
[7] Rec. Doc. 20
[8] Rec. Doc. 21.

3:10-CV-1461, 2011 WL 2162910, at *7 (N.D. Tex. May 9, 2011) ("When a petitioner has filed an untimely federal protective petition, a stay is simply not warranted."), adopted, 2011 WL 2164154 (N.D. Tex. June 2, 2011), aff'd, 521 F. App'x 316 (5th Cir. 2013).  Because petitioner's federal application was in fact already untimely at the time of filing for the following reasons, granting her a stay of these proceedings would serve no purpose.

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a petitioner is generally required to bring her § 2254 claims within one (1) year of the date on which her underlying state criminal judgment became "final."  28 U.S.C. § 2244(d)(1)(A).[9]  With respect to determining that date of finality, the United States Fifth Circuit Court of Appeals has explained:

> The statute of limitations for bringing a federal habeas petition challenging a state conviction begins to run on "the date on which the [state] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."  28 U.S.C. § 2244(d)(1)(A).  When a habeas petitioner has pursued relief on direct appeal through [her] state's highest court, [her] conviction becomes final ninety days after the highest court's judgment is entered, upon the expiration of time for filing an application for writ of certiorari with the United States Supreme Court.  Roberts v. Cockrell, 319 F.3d 690, 693 (5th Cir. 2003).

Butler v. Cain, 533 F.3d 314, 317 (5th Cir. 2008).

As noted, the Louisiana Supreme Court denied petitioner's direct-review writ application on October 15, 2018.  Accordingly, her state criminal judgment became final for AEDPA purposes on January 14, 2019.[10]  As a result, her one-year federal limitations period commenced on that date and then expired on **January 14, 2020**, unless that deadline was extended through tolling.

---

[9] Although 28 U.S.C. § 2244(d)(1) has alternative provisions providing for other events which can trigger the commencement of the statute of limitations, petitioner does not argue that any of those alternative provisions are applicable in the instant case.

[10] Because the ninetieth day of the period in the instant case fell on a Sunday, petitioner's deadline for seeking review by the United States Supreme Court was extended through the following Monday, January 14, 2019.  See Rules of the Supreme Court of the United States, Rule 30 ("In the computation of any period of time prescribed or allowed by these Rules, by order of the Court, or by an applicable statute, the day of the act, event, or default from which the designated period begins to run is not included.  The last day of the period shall be included, unless it is a Saturday, Sunday, federal legal holiday listed in 5 U.S.C. § 6103, or day on which the Court building is closed by order of the

The Court first considers statutory tolling. The AEDPA provides: "The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2). However, because petitioner had no such applications pending before the state courts at any time between January 14, 2019, and January 14, 2020, she clearly is not entitled to statutory tolling.

The Court must next consider equitable tolling. The United States Supreme Court has expressly held that the AEDPA's statute of limitations is subject to equitable tolling. Holland v. Florida, 560 U.S. 631, 645 (2010). However, "equitable tolling is unavailable in most cases …." Miles v. Prunty, 187 F.3d 1104, 1107 (9th Cir. 1999); accord Davis v. Johnson, 158 F.3d 806, 811 (5th Cir. 1998) (holding that the AEDPA's statute of limitations can be equitably tolled "in rare and exceptional circumstances"). Indeed, the Supreme Court held that "a petitioner is entitled to equitable tolling only if [she] shows both that (1) [she] has been pursuing [her] rights diligently, and (2) some extraordinary circumstance stood in [her] way and prevented timely filing." Holland, 560 U.S. at 649 (internal quotation marks omitted). A petitioner bears the burden of proof to establish entitlement to equitable tolling. Alexander v. Cockrell, 294 F.3d 626, 629 (5th Cir. 2002). In the instant case, petitioner has brought forth no evidence demonstrating that she is entitled to such tolling, and this Court knows of no reason that would support equitable tolling of the statute of limitations.

Lastly, the Court notes that a petitioner can overcome the AEDPA's statute of limitations by making a convincing claim of "actual innocence" under McQuiggin v. Perkins, 569 U.S. 383 (2013). In Perkins, the United States Supreme Court held:

---

Court or the Chief Justice, in which event the period shall extend until the end of the next day that is not a Saturday, Sunday, federal legal holiday, or day on which the Court building is closed.").

This case concerns the "actual innocence" gateway to federal habeas review applied in <u>Schlup v. Delo</u>, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), and further explained in <u>House v. Bell</u>, 547 U.S. 518, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006).  In those cases, a convincing showing of actual innocence enabled habeas petitioners to overcome a procedural bar to consideration of the merits of their constitutional claims.  Here, the question arises in the context of 28 U.S.C. § 2244(d)(1), the statute of limitations on federal habeas petitions prescribed in the Antiterrorism and Effective Death Penalty Act of 1996.  Specifically, ... can the time bar be overcome by a convincing showing that [the petitioner] committed no crime?

We hold that actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in <u>Schlup</u> and <u>House</u>, or, as in this case, expiration of the statute of limitations.  We caution, however, that tenable actual-innocence gateway pleas are rare:  "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt."  <u>Schlup</u>, 513 U.S., at 329, 115 S.Ct. 851; see <u>House</u>, 547 U.S., at 538, 126 S.Ct. 2064 (emphasizing that the <u>Schlup</u> standard is "demanding" and seldom met).

<u>Perkins</u>, 569 U.S. at 386.

Here, petitioner has not invoked <u>Perkins</u>.  However, in the event she does so in any objections to this Report and Recommendation, the undersigned finds that she has not made the showing required under <u>Perkins</u> for the following reasons.

In assessing a petitioner's claim of actual innocence, a court normally first examines the evidence presented at trial and on which the conviction was based.  <u>See, e.g.</u>, <u>Johnson v. Cain</u>, Civ. Action No. 14-543, 2015 WL 4528889, at *3 (E.D. La. July 27, 2015), <u>aff'd</u>, 667 F. App'x 474 (5th Cir. 2016); <u>Lyles v. Tanner</u>, Civ. Action No. 13-655, 2014 WL 4674673, at *6 (E.D. La. Sept. 17, 2014).  In the instant case, the Louisiana Fifth Circuit Court of Appeal summarized that evidence as follows:

On April 1, 2008, defendant's eight-year-old son, M.L. Lloyd, III, died as a result of injuries consistent with an extensive and severe beating.[FN 10]

[FN 10]  M.L. Lloyd Jr., M.L.'s biological father, testified that he and defendant lived together in Tangipahoa Parish for four and a half years prior to their separation.  M.L. was two years old at the time they separated; however, Mr. Lloyd remained in close contact with his son until one day when he arrived at

defendant's home to pick up his son and discovered that she was moving. Defendant would not give any information about where she was moving to. Despite attempting to locate her, Mr. Lloyd was unsuccessful and never saw his son again until he was notified four years later by a newspaper reporter of M.L.'s death. Mr. Lloyd testified that he made all of the funeral arrangements and that defendant's other four children, Toi Williams, Brandon Williams, Cordell Williams, and Kevin Otkins, all attended the funeral, but that defendant did not.

Dr. Richard Tracy, an expert in the field of forensic pathology, testified that he performed the autopsy on M.L. on April 2, 2008, the day after M.L. died. Dr. Tracy noted that M.L. had sustained extensive bruising over most of his torso, from the base of his neck to his buttocks, on both thighs, and also along his left forearm. The internal examination of M.L. confirmed that the bruising was deep tissue bruising, nor was there lividity.[FN 11] Over the lumbar and gluteal[FN 12] region, Dr. Tracy also identified impressed abrasions, which in his experience indicated that M.L.'s exposed back and buttocks area had been slid over a rough surface. Based on the appearance of the abrasions, Dr. Tracy concluded that they occurred close in time to the child's death.

[FN 11]  Lividity was explained as the change in skin color from pooling of blood and bodily fluids after death due to gravity.
[FN 12]  The gluteal muscles are a group of three muscles which make up the buttocks.

During the course of the autopsy, Dr. Tracy also observed distinctive "u-shaped" impressed bruise marks. In one location, the impressed marks displayed a pattern indicative of a doubled-over cord, such as an extension cord. Present on the front of M.L.'s body were also larger more circular patterned bruises and a bruise across the neck area caused by a hard object pressed across M.L.'s windpipe at an angle. In Dr. Tracy's opinion, the bruises were likely two to three days old and were sustained as a result of blunt force trauma.

Upon internal examination, Dr. Tracy determined that M.L. also suffered from a bruised lung, an injury sustained shortly before his death. He further opined that extensive deep bruising over a large portion of a child's body could cause death. He explained that extensive deep bruising brings about cardiovascular collapse, because the bruising causes a large volume of blood to seep into the tissues, impairing circulation. Dr. Tracy opined that the cause of M.L.'s death could have been either the result of the extensive, confluent deep bruising which caused cardiovascular death, or by asphyxia through the use of a blunt object pressed across M.L.'s windpipe, or both.[FN 13]

[FN 13]  Dr. Tracy's provisional anatomical diagnoses were forwarded to the St. John the Baptist Parish coroner, Dr. Christy Montegut. As coroner, Dr. Montegut issued the death certificate in this case. The first death certificate issued by Dr. Montegut on May 5, 2008, after obtaining Dr. Tracy's provisional anatomical diagnoses, listed the cause of death as asphyxia due to neck compression, and the manner of death was marked as "pending investigation." After obtaining supplemental information, including M.L.'s prior medical records and toxicology reports, Dr. Montegut amended the manner of death to "homicide."

Defendant, Mr. Victor, and Mr. Victor's son, Errol Victor, Jr., brought M.L. to the emergency room, but defendant and Errol, Jr. left within minutes, leaving Mr. Victor there. Registered nurse Clay Hubble was the first medical professional to come into contact with M.L. Mr. Victor told him that the child had "an accident in the bathroom." According to Nurse Hubble, the child was slumped over and not breathing.

Emergency room physician Dr. Dale Morris confirmed that upon M.L.'s arrival at the hospital, he was limp, unresponsive, had no heartbeat, his pupils were fixed and dilated, and he was cold to the touch. M.L.'s body temperature was 85.2 degrees upon arrival, more than fourteen degrees lower than the average rectal temperature of 99.6 degrees, plus or minus. Dr. Morris and Nurse Hubble noted that they saw no evidence of trauma until M.L.'s clothes were removed, at which point bruises on M.L.'s thighs, back, buttocks, chest, and abdomen were visible, along with the abrasions on his buttocks and lower back.

Nurse Hubble attempted to locate Mr. Victor to find out what happened to the child, and saw him in the parking lot of the hospital speaking with someone whom he believed to be defendant, who was seated inside her car. Mr. Victor was eventually escorted into the waiting room of the hospital, and when asked what happened to M.L., Mr. Victor told Nurse Hubble, "we had to discipline him" because he was stealing. Although Mr. Victor would not respond when asked if he hit M.L., he did state, "I take full responsibility for this."

The registration clerk at the hospital, Nico Savoie, testified that upon M.L.'s arrival at the hospital, defendant approached her and stated that her son was in the ambulance bay short of breath. Defendant then left the hospital with her stepson, Errol, Jr. Ms. Savoie testified that she attempted to obtain M.L.'s name and date of birth, to no avail. Rather, defendant told Ms. Savoie that her son had been to the hospital a couple days prior and that he had Medicaid. Ms. Savoie was eventually able to obtain M.L.'s name from Mr. Victor, after which she discovered that M.L. had never been treated at River Parishes Hospital as defendant had claimed.

M.L. was ultimately pronounced dead twenty minutes after his arrival at the hospital when efforts to resuscitate him failed.[FN 14] Dr. Morris opined that M.L. had probably been dead for a while; he stated that it would have taken over an hour for a person's body temperature to drop to 85.2 degrees.

> [FN 14] On the St. John the Baptist Parish Coroner's Office form, which was required to be filled out by the hospital and sent to the coroner's office, Dr. Morris listed the cause of death as "unknown," but deferred to the coroner's findings after performance of the autopsy.

St. John the Baptist Parish Sheriff's Officer Alkan Traveler, Sr. was dispatched to River Parishes Hospital regarding a juvenile victim later identified as M.L. When Officer Traveler arrived at the hospital in response to the call, he spoke to Dr. Morris and also observed that M.L. had numerous bruises on his thighs, buttocks, and lower back. After speaking with Dr. Morris, Officer Traveler approached Mr. Victor, who was in the waiting room with his attorney, Tregg Wilson, where he was asked to accompany Officer Traveler to the police station. Captain Kenneth Mitchell of the St. John the Baptist Parish Sheriff's Office, who

had also arrived at the hospital pursuant to the dispatch call, advised Mr. Victor of his Miranda[FN 15] rights and then instructed Officer Traveler not to speak to defendant during his transport to the police station. While transporting Mr. Victor to the police station, Officer Traveler overheard Mr. Victor speaking to someone whom Officer Traveler believed to be defendant on the telephone, advising her not to speak to "the police or anyone else," and to make sure the children did the same. He further stated, "what has happened has happened and [I] cannot change the past. ... [Y]ou lost a son today and you're about to lose your husband to prison." According to Officer Traveler, Mr. Victor also stated that he would take "full responsibility" for what happened. Once at the police station, Captain Mitchell again advised Mr. Victor of his Miranda rights in the presence of his attorney. No statements were obtained, and Mr. Victor was arrested.

[FN 15]  Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Detective Christie Chauvin, also of the St. John the Baptist Parish Sheriff's Office, likewise arrived at River Parishes Hospital in response to a call made by a hospital employee regarding an unresponsive child "covered in bruises." Upon arrival at the hospital, Detective Chauvin learned from the hospital staff that the child had died and that the mother of the child had left the hospital.[FN 16] Detective Chauvin testified that she was familiar with Mr. Victor and knew that he had other children, so she requested that a patrol deputy be dispatched to their home to ensure the safety of the other children. The officers dispatched to defendant's home discovered that no one was present and that defendant's vehicle was also not there.

[FN 16]  Detective Chauvin also reviewed video surveillance footage from the hospital security cameras. On the video, Mr. Victor's son, Errol Victor, Jr., is seen carrying M.L.'s limp body through the ambulance bay doors, accompanied by Mr. Victor. Defendant is also seen exiting the driver's side of a Cadillac Escalade and entering the emergency room. On the videos, both Mr. Victor and Errol Victor, Jr. then exit the triage room door, where they were met by defendant, and proceed to exit the hospital, at which time defendant and Errol Victor, Jr. drive away in the Escalade.

Pursuant to Captain Mitchell's request, Tregg Wilson, Mr. Victor's attorney, agreed to contact defendant and urge her to return to her residence.[FN 17] Defendant eventually returned to the residence and was taken to the police station for questioning. The Cadillac Escalade she was driving was searched, revealing over $180,000 in cash, as well as an envelope with attorney Mr. Wilson's phone number on it.[FN 18] Once at the police station, defendant was placed under arrest and read her Miranda rights.

[FN 17]  Defendant informed Mr. Wilson that she was in Destrehan.
[FN 18]  Defendant testified that she did not know about the money in the car, but that Mr. Victor sometimes carried cash in the car.

Captain Mitchell testified that defendant and Mr. Victor were originally scheduled for trial in this matter on August 16, 2011; however, they did not appear in court for trial. Defendant and Mr. Victor were eventually located in April of 2012 in Tifton, Georgia, and extradited to Louisiana for trial.

Dr. Scott Benton, an expert in the field of pediatrics and child abuse pediatrics, was retained by the State to evaluate the case and testified at trial. As part of his evaluation, Dr. Benton reviewed the following documentation: the investigative report from the Sheriff's Office; the certificate of death; the autopsy report and associated toxicology report; the River Parishes Hospital emergency record; treatment records from M.L.'s prior treating physician, Dr. Angelo Lobue; relevant photographs; and the testimony provided at certain pretrial hearings conducted in this matter. After his review of the documentation, Dr. Benton opined that M.L. died as a "consequence of injuries that were definitively sustained by physical abuse."[FN 19] When reviewing the autopsy photographs, Dr. Benton found it of particular interest that M.L. had sustained numerous "patterned" bruises over portions of his body. He explained that patterned bruises take the shape or image of the object that caused the bruise. He noted that the bruising that took the shape of a looped pattern could have been from a cord, a belt, or an object that had the ability to be "thin or on edge." Dr. Benton testified that this type of pattern indicates an injury that cannot be self-inflicted. Dr. Benton further noted that the injuries sustained by M.L. involved multiple planes, or surfaces on the body, providing further proof that the injuries were inflicted by someone else. Also, the looped pattern of the bruises indicated to Dr. Benton that M.L. was not clothed at the time they were inflicted.

[FN 19] Dr. Benton testified that in his twenty years of experience reviewing thousands of child death cases, in only a minority of cases has the ultimate conclusion been that the child died from an act or commission of physical abuse.

Dr. Benton testified that the extensive bruising on M.L.'s back that extended all the way down to his buttocks and to the back of his thighs exhibited a pattern injury consisting of linear patterns and abrasions where the skin had been scraped off by the object used to hit M.L. These injuries further confirmed to Dr. Benton that M.L. was not clothed at the time the physical abuse was inflicted. He further testified that the linear pattern seen on M.L.'s backside was indicative of M.L. being struck with a broad paddle or a belt multiple times.

Additionally, Dr. Benton opined that the injuries sustained to M.L.'s forearm were of importance because they indicated that M.L. attempted to block the hits that were inflicted upon him. He further noted that there appeared to be "grab marks" or restraint marks over M.L.'s lower wrist and upper arm. Dr. Benton concluded that in his opinion, strong contributors to M.L.'s death were the severe bruising to his back and torso, and/or asphyxia by compression of the neck. He opined that to a reasonable degree of medical certainty, M.L. suffered unjustifiable pain and suffering and died as a result of cruelty.

Lieutenant Pat Baudoin, director of the Child Advocacy Center in St. Charles Parish, testified that she interviewed Toi Williams, Brandon Williams,

Cordell Williams, and Kevin Otkins, M.L.'s half-brothers. Their statements were introduced into evidence.

Toi Williams, who was twenty-one years old at the time of trial, testified at trial that at the time his half-brother M.L. died, six years prior to trial, he was fifteen and living with Mr. Victor (his stepfather) and defendant, as well as his brothers (Brandon Williams and Cordell Williams) and half-brothers (M.L., Kevin Otkins, Ian Victor, and Jaubert Victor), along with Mr. Victor's sons (Errol, Jr., Trent, Fabian, Marcus, Emmanuel, and Chance Victor). Toi said that he and his brothers were home-schooled in a business building Mr. Victor owned near their home. Toi recalled that the day before M.L. died, he and his brothers were at the building where they were home-schooled, and Mr. Victor had given each of them an ice cream before they left for the day. When they arrived home, Mr. Victor told them that he had discovered that someone had stolen an ice cream and he wanted to know who had taken it. According to Toi, a few of the boys were whipped, including M.L., whom Mr. Victor whipped with a belt. Later, after M.L. admitted to taking the ice cream, Mr. Victor sent the other boys upstairs and continued to beat M.L., "throwing him around," and punching him in the chest. Mr. Victor then proceeded to throw M.L. against the stairs.

Toi testified that Mr. Victor told M.L. to wait outside on the porch because he was going to call the police. According to Toi, the police arrived, but he was unaware whether M.L. had spoken with them. M.L. was eventually brought back inside the house and denied dinner that night. Toi recalled that once inside, Mr. Victor continued to beat and punch M.L. The next morning, Mr. Victor dragged M.L. out of bed and again began beating M.L. and "slinging" him around. Toi stated that he, Errol, Jr., and Emmanuel were then ordered to restrain M.L. Toi testified that he was eventually replaced by another one of Mr. Victor's sons because he wasn't "holding him tight enough." Toi recalled that M.L.'s face, wrists, and legs were pinned down while Mr. Victor and Fabian (pursuant to Mr. Victor's order) beat M.L., who had been stripped down naked, with a belt. Toi testified that the beating lasted for an hour or longer.

During the beating, Mr. Victor called defendant upstairs to witness the beating where she watched and cried, but did not physically or verbally attempt to stop Mr. Victor. Toi stated that he observed bruises on M.L.'s arms and scratches on his backside that were bleeding from the belt used to beat him. He further recalled that Mr. Victor put alcohol on the scratches and then continued to beat M.L. According to Toi, the beating stopped for a few moments while Mr. Victor and defendant went outside to tend to some housework, but when Mr. Victor returned inside, he went back upstairs and continued beating M.L. Toi stated that he could hear Mr. Victor "throwing M.L. around."

Later, Mr. Victor instructed his son Fabian to go to the store to pick up ice and Pedialyte. After Fabian returned from the store, Mr. Victor then ordered Brandon to retrieve clothes for M.L. because they were going to take him to the hospital. Toi testified that he observed Mr. Victor take his laptop upstairs with him. Toi assumed that Mr. Victor was trying to find out what was wrong with M.L. because he stated that M.L. was not breathing. M.L. was eventually taken to the hospital by defendant, Mr. Victor, and Errol, Jr. Defendant then returned from the

hospital a short time later, at which time she gathered the children and left the house. Toi testified that defendant was crying and talking about driving to Tennessee. Toi recalled that while in the car, defendant received a phone call that the police were at their house. On their way home, defendant instructed her children not to say anything to the police, stating, "You're doing this for M.L."

Toi's twenty-year-old brother, Brandon Williams, corroborated Toi's account of the events surrounding M.L.'s death. Brandon confirmed that the day before M.L. died, they were at Mr. Victor's office building where they were home-schooled. He also recalled that before recessing for the day, Mr. Victor gave them each an ice cream. When they had returned to the house, Mr. Victor stated that an ice cream was stolen and he wanted to know who had taken it. Brandon testified that Mr. Victor blamed him and his half-brother M.L. Mr. Victor then whipped both Brandon and M.L. with a belt. According to Brandon, M.L. eventually confessed to taking the ice cream, so Mr. Victor instructed his son Trent to whip M.L. because he said "Trent whooped the hardest." He recalled that Mr. Victor then ordered M.L. to go outside because he was going to call the police. Later that evening, Brandon was told that he was not allowed to eat dinner, so he went upstairs and could hear M.L. crying while Mr. Victor hit him.

The next morning, Brandon recalled that Mr. Victor pulled M.L. out of bed and continued to beat him with a belt while Errol, Jr. and Emmanuel held him down by his wrists and legs. Brandon testified that when Mr. Victor was done whipping M.L., he sat down and instructed his other sons, either Marcus, Trent, or Fabian, to continue the beating while Mr. Victor asked M.L. if he was sorry for what he had done. Brandon stated that the beating went on for approximately two hours. At one point, Brandon recalled defendant being called upstairs by Mr. Victor to watch the beating and that she told Mr. Victor to stop because she did not want to see it.

Once the beating stopped, Brandon testified that M.L. could not move and looked tired. Later, Mr. Victor eventually returned to M.L.'s room, where Brandon could hear "a lot of bumping," before he was called upstairs to gather M.L.'s clothes. Brandon testified that when he went upstairs, defendant was putting ice on M.L.'s stomach and attempting to get M.L. to say "momma," but he would not respond. According to Brandon, Mr. Victor then began to look up M.L.'s medical condition on the computer before determining whether or not to take him to the hospital. Brandon testified that Mr. Victor stated he was going to "wait a couple of minutes ... to see if M.L. going to come back," and if not, he would take him to the hospital. Brandon recalled that Mr. Victor then went to change his clothes stating, "If I go out, I'm going to go out clean." After waiting approximately five minutes and realizing M.L. was not going to be all right, defendant, Mr. Victor, and Errol, Jr. took M.L. to the hospital.

Brandon further testified that Mr. Victor instructed defendant to leave town and drive to Tennessee, but that defendant did not want to go, so they returned to the house where she advised her sons not to say anything about what had happened.[FN 20]

[FN 20] Brandon testified that when he was first interviewed, he did not tell the truth as to what happened to M.L. because he was instructed not to by defendant who stated, "We're doing this for M.L."

Cordell Williams[FN 21] also corroborated Toi and Brandon's testimony as to the events leading up to M.L.'s death. He confirmed that Mr. Victor whipped Brandon and M.L. with a belt because he believed one of them had stolen an ice cream sandwich. Cordell further testified that once M.L. admitted to taking the ice cream, Mr. Victor whipped him with the assistance of his son Trent on the evening of March 31, 2008. Cordell recalled that M.L. was sent outside for a couple of hours before being brought inside where Mr. Victor beat him again with his fists, hitting him in the face, punching him in the chest, and kicking him.

[FN 21]  At the time of trial, Cordell was eighteen years old.

Early the next morning, Cordell observed Mr. Victor pull M.L. out of bed and continue the beating. Mr. Victor then called everyone into M.L.'s room where M.L. was on the floor, face down, and Mr. Victor was beating him with a belt. Eventually M.L.'s clothes were removed and the beating continued by one of Mr. Victor's sons at Mr. Victor's instruction. Cordell stated that he observed M.L. bleeding on his backside. He further recalled that Mr. Victor stated "I'm going to keep whopping you until I see tears come out your eyes."

Cordell also confirmed that at one point, Mr. Victor called defendant upstairs to watch. Cordell testified that defendant was crying and saying she didn't want to watch. She told Mr. Victor to stop, but only once. Cordell testified that the beating went on for a long time before Mr. Victor went back downstairs. Cordell testified that he was downstairs with his brothers, helping in the garden, when he saw Mr. Victor go back upstairs and heard "a lot of bumping," as if Mr. Victor was throwing M.L. against the wall. Cordell recalled that after twenty or thirty minutes, Mr. Victor instructed Errol, Jr. and his other son Fabian to go to the store to purchase ice and Pedialyte. After they returned from the store, Brandon was instructed to gather clothes for M.L. before M.L. was taken to the hospital. Cordell testified that M.L. was not moving when they carried him to the car. Cordell further confirmed that they were going to drive to Tennessee until defendant changed her mind and decided to go back home, where she instructed her sons to lie about their original plan.

Kevin Otkins confirmed the same accounts as relayed by Toi, Brandon, and Cordell, recalling that M.L. was beaten by Mr. Victor with a belt for two days over a stolen ice cream.

Marcus, Emmanuel, and Chance Victor, Mr. Victor's biological children, refused to speak during their interviews at the Child Advocacy Center, but testified for the defense at trial, along with Fabian and Trent Victor, providing a different account of the events from their stepbrothers Toi, Brandon, Cordell, and Kevin.

Marcus Victor testified that he was not present at the building where they were home-schooled the day before M.L.'s death. However, he recalled that later that evening, at their house, Mr. Victor had a discussion with his sons about stealing. He noted that Cordell, Brandon, Toi, and Kevin were not cooperating, and that Mr. Victor stated that he was going to Tennessee for two weeks and that if their behavior continued, everyone that did not have the last name "Victor" would have to leave when he returned. Marcus testified that there were no "spankings or

whippings" on that day.  He further recalled that Mr. Victor sent M.L. and Brandon to bed that night without dinner.  This, however, was contradictory to Marcus's statement provided to the Office of Community Service ("OCS") during which he stated that M.L. was whipped by Mr. Victor six times before being sent to bed.[FN 22]

> [FN 22]  Marcus denied giving a statement to OCS wherein he stated that Mr. Victor "whipped M.L. and gave him six licks."

The following morning, Marcus recalled that defendant was angry with M.L. for his behavior on the previous day so she "whoop[ed] him bad."  Marcus further testified that while this was occurring, Mr. Victor was not at home and that neither he, Fabian, nor Errol, Jr. beat M.L.  Once Mr. Victor returned home, he called a family meeting upstairs, where he informed his stepsons that they had to leave the house.  According to Marcus, after the meeting, Cordell, Toi, Brandon, and M.L. remained upstairs and were "fussing with each other."  Later, M.L. stated that he was not feeling well, so Mr. Victor and defendant went upstairs to check on him.  Marcus testified that it was at this time that they discovered M.L. was not breathing.  According to Marcus, Mr. Victor performed CPR on M.L. before driving him to the hospital.

When questioned as to Mr. Victor's disciplinary practices, Marcus testified that Mr. Victor would discipline him and his siblings by having them run laps around the house.  However, he then admitted that when he provided a statement to OCS, he stated that Mr. Victor disciplined him by whipping.[FN 23]  Marcus further testified that he never mistreated his stepbrothers and that it was his stepbrothers that would fight amongst themselves.

> [FN 23]  On re-direct, Marcus testified that his father had a "no whipping" policy.

Fabian Victor, another of Mr. Victor's sons, denied restraining M.L. while Mr. Victor beat him.  He further testified that his father had a "no whipping policy," and that he would discipline his children by having them write down Bible scriptures or run laps.  Fabian recalled that on the evening before M.L. died, Mr. Victor had M.L. and Brandon stand on the porch and wait for the police as a "scare tactic" for stealing.  He further stated that Mr. Victor then sent M.L. and Brandon to bed that night without dinner and that neither M.L. nor Brandon were beaten or whipped that day.  However, the next morning, Fabian testified that defendant called a family meeting and told her sons that they were going to have to live with their biological fathers because they were being disobedient.  According to Fabian, defendant then whipped M.L. and Brandon with a belt for "what they did the day before."  He testified that he saw defendant whip M.L. three or four times, but noted that he also did not stay for the entire whipping.  Fabian testified that Mr. Victor was not at home that morning and that his father never whipped M.L.  He further stated that he never saw any marks or bruises on M.L. and that when defendant whipped him, he was wearing his clothes.  Fabian testified that after M.L. was taken to the hospital, he and some of his brothers drove to Home Depot when they received a call from defendant telling them to return home.[FN 24]

13

[FN 24]  Fabian further testified that when they returned to the house, the police were not present. He stated that the police arrived a short time later.  This testimony is at odds with police dispatch logs indicating that officers arrived on the scene to an empty house.

Emmanuel Victor testified that on the day before M.L.'s death, M.L. was not whipped.  He testified that on the morning of M.L.'s death, Mr. Victor was not at home, and that he saw defendant whipping M.L. with a belt for stealing ice cream.[FN 25]  Sometime later, Emmanuel recalled that defendant called a family meeting where she informed her sons that if they did not behave appropriately, they would be sent to live with their biological fathers.  He testified that after the meeting, Toi, Brandon, Cordell, and Kevin stayed upstairs with M.L.  According to Emmanuel, noises were heard from upstairs prompting defendant to return upstairs to find Cordell beating M.L.  He further testified that he was told M.L. suffered from an asthma attack.

[FN 25]  On cross-examination, Emmanuel was confronted with his grand jury testimony during which he testified that he never saw defendant strike M.L., but that he heard it.

Trent Victor testified that on the morning of April 1, 2008, he came out of the bathroom and witnessed defendant whipping M.L. with a belt.  He further stated that at that time, his father was not at home.  Trent testified that later that morning, after defendant conducted a family meeting, he went upstairs and observed Brandon and Cordell fighting M.L. in the bedroom closet.[FN 26]  Trent broke up the fight and overheard Brandon and Cordell blaming M.L. for having to be sent away.  Trent reported the fighting to defendant and then went back upstairs to bring M.L. some food.  According to Trent, M.L. did not want to eat and was "breathing funny."  At that time, defendant instructed one of her sons to call Mr. Victor.[FN 27]  Trent testified that when his father left for the hospital with M.L., he and some of his siblings went to Home Depot.  Police officers were at the house upon their return.

[FN 26]  On June 30, 2009, Trent drafted a handwritten statement detailing the events that took place on the day M.L. died, and in his statement, he did not mention that Brandon fought with M.L.  He also provided a recorded statement to the police in July of 2009 and admitted that he did not mention any fighting that had occurred between Brandon and M.L.  Trent also admitted that in July of 2009, he provided a statement to the police where he stated that Cordell was "just swinging" at M.L.
[FN 27]  This testimony was contradictory to Trent's aforementioned June 30, 2009 handwritten statement where he noted that defendant came home halfway through the family meeting conducted by defendant.

Chance Victor testified that on the morning of M.L.'s death, he woke up to "commotion" and was instructed by defendant to go downstairs and watch his younger brothers, Ian and Jaubert.  Chance testified that Mr. Victor was eventually called to come back home because M.L. was not feeling well.  Once Mr. Victor arrived home, Chance recalled that defendant, his father, and Errol, Jr. left to take

14

M.L. to the hospital.  Chance further testified that defendant admitted to whipping M.L., but that he did not personally observe defendant whipping M.L.  He noted that Cordell, Brandon, M.L., and Toi had behavioral problems.  After the incident, Chance declined to give a statement to OCS.

Kerry Brown testified that he knew Mr. Victor because he had represented him in a civil legal matter.  He testified that Mr. Victor had sought his advice regarding discipline problems he was having with defendant's children and alternative schooling options.  He recalled that Mr. Victor had a tiered discipline structure and that a neighbor complained about one of Mr. Victor's disciplinary techniques which involved his children running laps around their home.  Mr. Brown further testified that after the Victors were indicted, defendant went to his house and told him that "this thing with Errol is all wrong because Errol wasn't even there" and that defendant told him she "beat the kids."  Mr. Brown also testified that he never personally saw Mr. Victor engage in physical violence.

Defendant took the stand to testify for Mr. Victor after being informed of her Fifth Amendment rights.  She testified that when Mr. Victor asked her to marry him, she informed him that her sons, Toi, Brandon, Cordell, Kevin, and M.L. had behavioral issues.  Defendant admitted that on the day of M.L.'s death, she spanked Toi, Brandon, and Cordell, and also "chastised"[FN 28] M.L.  She further maintained that Mr. Victor was not present on the morning of M.L.'s death.  She then testified that she had a meeting with her sons that morning during which she told them she was tired of their "behavioral problems."  Defendant testified that after the meeting, everyone went downstairs except for Toi, Cordell, and M.L.  While downstairs, defendant stated that she heard tussling and fighting going on upstairs.  Her stepson Trent advised her that Cordell was fighting with M.L. in the bedroom closet.  Defendant then went upstairs and asked M.L. what had happened, to which M.L. replied, "Cordell fighting me and he was fighting me because he said that I told on him ... that he took the ice cream instead of me."  After M.L. stated that he was "going to be alright," defendant testified that she whipped Cordell.

[FN 28]  Throughout her testimony, defendant used the words "chastised" and "whooped" interchangeably.  In her July 10, 2009 statement, she stated that when she "whooped" M.L., it was with a belt on his buttocks.

Sometime later, defendant went back upstairs to check on M.L. and witnessed Toi, Brandon, and Cordell fighting M.L.  Defendant admitted, however, that she provided a voluntary written statement on June 26, 2009, in which she made no mention of Brandon, Toi, or Cordell fighting with M.L., nor mentioned Trent having to break up a fight between Cordell and M.L.  (The first time defendant mentioned Brandon and Toi fighting with M.L. was in a statement dated December 15, 2010.)  She stated that the reason they were fighting was because she had previously told them they would have to live with their biological fathers because of their behavioral issues.  At one point, defendant testified that she and Mr. Victor had entertained the idea of giving Mr. Victor's sister custody of Cordell because he would bully his younger brothers Ian, Jaubert, and M.L.

Defendant testified that Mr. Victor did not whip, beat, kick, or hit M.L. the day before or on the day of his death.  She further testified that on the day of M.L.'s

death, M.L. stated that he was tired and could not breathe, so she had one of her sons call Mr. Victor and tell him to come home because there was an emergency.[FN 29]  When Mr. Victor arrived home on April 1, 2008[FN30] and saw M.L., he believed M.L. was dehydrated, so he sent one of his sons to buy Pedialyte and ice.  Defendant also noted that Mr. Victor sought medical advice from a doctor on the internet,[FN 31] and pursuant to the advice received, immediately took M.L. to the hospital.[FN 32]  Defendant stated that she saw bruises on M.L.'s body, but not to the extent shown in the autopsy photographs.  Defendant testified that M.L. was coherent and lucid for a portion of the mile and a half drive to the hospital.

> [FN 29]  Defendant testified that M.L. was born with bronchitis, and as a result, was kept in the hospital for a week following his birth.  However, M.L. was never treated for asthma after 2003, according to medical records in evidence, a condition Mrs. Victor claimed he suffered from.
> [FN 30]  In the various statements provided by defendant, her testimony differs as to the timing of when her husband arrived home that day.
> [FN 31]  When the police searched the Victors' home, the laptop computer was not at the residence.  Defendant could not explain why it was missing.
> [FN 32] On cross-examination, defendant denied telling the social worker, Carliss Johnson, that she came home and found M.L. unresponsive so she took him to the hospital.

Defendant explained that she did not remain at the hospital after M.L. was dropped off at the emergency room because she had to bring Errol, Jr. back home.[FN 33]  When she returned home, she noticed that some of her children had left, so she called and instructed them to come back to the house because she was going to drive back to the hospital.  According to defendant, while en route to the hospital, Mr. Victor called her and told her that M.L. was dead and that he had been arrested.  Defendant then returned to the house where she was arrested.

> [FN 33]  The video footage taken from the hospital cameras confirm that defendant was at the hospital for two minutes and twenty seconds.

Robert Taylor testified that he attended church with Mr. Victor's brother, and because he became interested in the Victors' case, a meeting was arranged between himself and defendant.  During one of the meetings, defendant invited Mr. Taylor to her house to record a statement she wanted to make for the public.  In the video, defendant declared that Mr. Victor was not present when she chastised M.L. Mr. Taylor also testified that defendant stated that Mr. Victor did not approve of her whipping the children.[11]

---

[11] State v. Otkins-Victor, 193 So. 3d 479, 490-500 (La. App. 5th Cir. 2016).

As noted, based on that evidence, the jury unanimously found petitioner guilty of manslaughter. On direct appeal, the Louisiana Fifth Circuit Court of Appeal held that the foregoing evidence was sufficient to support the guilty verdict under Louisiana law, explaining:

> In the present case, defendant was charged with second degree murder while in perpetration of the crime of cruelty to a juvenile, but was convicted of the responsive verdict of manslaughter.[FN 35]
>
>> [FN 35] The jury was instructed as to the manslaughter responsive verdict, pursuant to La. R.S. 14:31. The trial court instructed the jury that manslaughter "is the killing of a human being when the defendant has a specific intent to kill or to inflict great bodily harm but the killing is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection; or the killing of a human being without any intent to cause death or great bodily harm when the offender is engaged in the perpetration or attempted perpetration of the following felonies or misdemeanors ... simple battery, aggravated battery, second degree battery, aggravated second degree battery."
>
> Evidence that would support a conviction of a charged offense would necessarily support a conviction of an authorized responsive verdict or lesser included offense. State v. Simmons, 01-0293 (La. 5/14/02), 817 So.2d 16, 19. Manslaughter is an authorized responsive verdict to a charge of second degree murder. La.C.Cr.P. art. 814(A)(3). When a defendant does not object to a legislatively established responsive verdict, the defendant's conviction will not be reversed, whether or not that verdict is supported by the evidence, as long as the evidence is sufficient to support the offense charged. State v. Johnson, 11-336 (La.App. 5 Cir. 2/14/12), 91 So.3d 365, 371, writ denied, 15-0044 (La. 5/22/15), 170 So.3d 984; see also State v. Harris, 02-1589 (La. 5/20/03), 846 So.2d 709, 712-13; State ex rel. Elaire v. Blackburn, 424 So.2d 246, 252 (La. 1982), cert. denied, 461 U.S. 959, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983).
>
> Here, defendant did not object to the responsive verdict of manslaughter prior to the jury rendering its verdict. The evidence must support either the responsive verdict returned or the crime charged. Harris, 846 So.2d at 715. In the instant matter, the evidence was sufficient to support the charged offense, as the jury could have found that defendant acted as a principal to the second degree murder of M.L.; thus, we find defendant's contention that the evidence does not support her conviction for manslaughter is without merit.
>
> In the jury instructions given at the trial, the trial judge instructed the jury as to the law of principals as follows: "[a]ll persons concerned in the commission of a crime are principals and are guilty of the crime charged if, whether present or absent, they directly commit the act constituting the crime, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime." La. R.S. 14:24. Thus, the jury could have convicted defendant of the murder of M.L. even if they believed that she did not personally inflict the fatal injuries he suffered.

17

The trial judge also instructed the jury on the definition of second degree murder. Under La. R.S. 14:30.1(A)(2)(b), at the time of the offense,[FN 36] second degree murder, while in perpetration of the crime of cruelty to a juvenile, is defined as, "the killing of a human being:  ... [w]hen the offender is engaged in the perpetration of cruelty to juveniles, even though he has no intent to kill or to inflict great bodily harm."  This section of La. R.S. 14:30.1 contains the circumstances under which a defendant can be found guilty under the felony murder rule, which dispenses with the necessity of proving *mens rea* accompanying a homicide; the underlying felony supplies the culpable mental state.  State v. Small, 11-2796 (La. 10/16/12), 100 So.3d 797, 805.  The underlying felony that defendant was charged with was cruelty to a juvenile, which is defined in La. R.S. 14:93(A)(1) as the "intentional or criminally negligent mistreatment or neglect by anyone seventeen years of age or older of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child."

> [FN 36]  The Louisiana Supreme Court has consistently held that "the law in effect at the time of the commission of the offense is determinative of the penalty which the convicted accused must suffer."  State v. Sugasti, 01-3407 (La. 6/21/02), 820 So.2d 518, 520-22.

Thus, in order for the State to prove that defendant was guilty of second degree murder pursuant to La. R.S. 14:30.1(A)(2)(b), it had to establish either:  (1) that defendant intentionally mistreated or neglected M.L.; or (2) that defendant was criminally negligent in her mistreatment or neglect of M.L.  The term "intentional" within the meaning of this statute requires general criminal intent to cause a child unjustifiable pain and suffering.  State v. Cortez, 96-859 (La.App. 3 Cir. 12/18/96), 687 So.2d 515, 519 (citing State v. Morrison, 582 So.2d 295 (La.App. 1 Cir. 1991)).  Mistreatment, as used in this statute, means "abuse."  Cortez, 96-859, 687 So.2d at 519 (citing State v. Comeaux, 319 So.2d 897, 899 (La. 1975)).  Moreover, to be criminally negligent in her mistreatment or neglect of the child, a defendant must have such disregard for the interest of the child that the conduct amounted to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances.  State v. Porter, 99-1722 (La.App. 3 Cir. 5/3/00), 761 So.2d 115, 123; see also La. R.S. 14:12.

On April 1, 2008, defendant and Mr. Victor dropped off an unresponsive eight-year-old boy at the emergency room of River Parishes Hospital.  Upon arrival at the hospital, defendant's son, M.L., had no heartbeat, his pupils were fixed and dilated, and he was cold to the touch.  Based on his body temperature, emergency room physician Dr. Morris opined that M.L. had likely been dead for "a while."  Bruises were also observed all over M.L.'s body, concentrated on his back.  In response to a nurse's question to him to determine what had happened to the child, Mr. Victor stated to a nurse attending to M.L., "we had to discipline him" because M.L. was stealing.  Mr. Victor further stated to both hospital personnel and a law enforcement official that he would take "full responsibility" for what happened.

While Mr. Victor remained at the hospital, defendant quickly left the premises.  Despite her son's dire condition, the video footage taken from the hospital cameras confirmed that defendant only remained at the hospital for a total

of two minutes and twenty seconds before leaving. During this brief period of time, registration clerk Nico Savoie attempted to obtain M.L.'s personal information but to no avail. Upon learning that defendant had hurriedly left the hospital, Detective Chauvin dispatched officers to defendant's home, concerned for the safety of defendant's other children. The officers arrived to an empty house, later learning that defendant had taken her children and had reached Destrehan, Louisiana, before she was urged by Mr. Victor's attorney to return to their residence. Defendant's sons testified that while on their way home, defendant instructed them not to talk to the police, stating "You're doing this for M.L."

Forensic pathologist, Dr. Tracy, performed the autopsy on M.L. He testified regarding the extensive, widespread bruising that covered M.L.'s body, which included circular patterned and distinctive "u-shaped" bruise marks. Dr. Tracy also testified regarding a bruise across M.L.'s neck area, which he opined was caused by a hard object pressed across M.L.'s windpipe. He explained that such extensive deep tissue bruising over a large portion of a child's body could cause death. Thus, Dr. Tracy concluded that the cause of M.L.'s death could have been either the result of the extensive, confluent deep bruising which caused cardiovascular death, or by asphyxia through the use of a blunt object pressed across M.L.'s windpipe, or both. This evidence was uncontroverted.

After reviewing the evidence in this case, Dr. Benton, an expert in the field of pediatrics and child abuse pediatrics, opined that M.L. died as a "consequence of injuries that were definitively sustained by physical abuse." He explained that the patterned bruises observed on M.L.'s body were likely produced by a cord, a belt, or a thin object and that a child could not inflict such injuries upon himself. Dr. Benton further testified regarding the defensive wounds seen on M.L.'s forearm and the restraint marks found on his wrists and upper arms. Dr. Benton concluded that in his opinion, strong contributors to M.L.'s death were the severe bruising to his back and torso and/or asphyxia by compression of the neck. He opined that to a reasonable degree of medical certainty, M.L. suffered unjustifiable pain and suffering and died as a result of cruelty. The purpose of presenting the evidence of the painful nature of the injuries suffered by M.L. and the fact that they were not inflicted accidentally, but instead were intentionally inflicted, was to negate any claim of accidental injury and to prove the elements of cruelty to a juvenile.

Additionally, all four of defendant's children, Toi, Brandon, Cordell, and Kevin, testified consistently with one another and with the physical evidence in this case. It was their testimony that Mr. Victor beat M.L. with a belt over the span of two days after learning that M.L. had taken an ice cream without permission. They recalled the horrific details surrounding the beating, including Mr. Victor's instruction to his older sons to restrain M.L. during the severe beating while defendant watched, with minimum interference. Toi also recalled the delay in transporting M.L. to the hospital despite the fact that M.L. was not breathing and the instruction given by defendant not to talk to the police.

Defendant's stepchildren, Marcus, Emmanuel, and Chance, provided a different account of the events leading up to M.L.'s death. They all claimed that defendant whipped M.L. on the day of his death and that their father, Mr. Victor, was not home at the time. They also maintained that M.L.'s clothes were on while

he was whipped, which was inconsistent with the physical evidence of the patterned bruising and M.L.'s scraped buttocks. Defendant's stepson, Trent, also testified that later that morning, he went upstairs and observed Brandon and Cordell fighting with M.L. Lastly, at trial, defendant admitted to "chastising" M.L. on the day of his death and maintained that Mr. Victor was not present at the time. She further stated that she observed Toi, Brandon, and Cordell fighting M.L. later that day. It is noted as well that defendant's various statements successively add more details regarding the fact and extent of the brothers' fighting with M.L., details that were not mentioned in the first statement, as noted above in this opinion.

The jury was presented with the conflicting testimonies of defendant's children, her stepchildren, and her own admission that she "whopped" M.L. but, according to defendant, did not cause his death. The jury chose to believe the State's witnesses over the defense witnesses. The jury's conclusion regarding the credibility of the witnesses is dependent upon its in-court observation, and when faced with a conflict in testimony, the jury is free to accept or reject, in whole or in part, the testimony of any witness. See State v. Alexander, 12-836 (La.App. 5 Cir. 5/23/13), 119 So.3d 698, 702, writ denied, 13-1981 (La. 3/21/14), 135 So.3d 614; State v. Rowan, 97-21 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056. It is the fact-finder who weighs the respective credibility of the witnesses, and this Court will generally not second-guess those determinations. See State v. Hughes, 05-0992 (La. 11/29/06), 943 So.2d 1047, 1051. The jury, faced with the physical evidence in this case coupled with the witness testimony presented by both the State and the defense, was within its discretion to believe the State's witnesses regarding the severe and extensive beating committed upon M.L. by Mr. Victor while defendant stood by, refusing to significantly intervene or seek timely medical treatment for M.L.'s injuries.

In order to convict defendant of second degree murder the State could have proved defendant actually caused the fatal injuries or that she was a principal to the crime. It appears defendant's alternate hypothesis of innocence, namely, M.L.'s alleged past medical history being a large contributing factor in the cause of his death, was rejected by the jury and that defendant's conduct of essentially idly standing by while her son was beaten to death over the span of hours by her husband confirmed her participation as a principal to the crime under La. R.S. 14:24. Moreover, defendant's actions inside their home while M.L. was brutally beaten, coupled by her delay in seeking medical treatment for M.L.'s injuries and her actions after she dropped M.L.'s lifeless body off at the emergency room of the hospital, further established such disregard for the interest of M.L. that her conduct amounted to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances.[FN 37]

[FN 37] See Porter, supra. In Porter, the defendant was convicted of second degree murder while in perpetration of cruelty to a three-year-old child. On appeal, the defendant argued that the State failed to prove that he inflicted the fatal blow because the State did not exclude the reasonable hypothesis that the victim's mother inflicted it. The court of appeal affirmed the conviction, finding, that pursuant to La. R.S. 14:30.1(A)(2)(b), the State could either prove the defendant actually caused the fatal injuries or was a principal to the crime. The court further found that the victim died either while the defendant intentionally mistreated the

> victim by inflicting painful injuries upon her, or while the defendant had such
> disregard for the interest of the child that his conduct amounted to a gross
> deviation below the standard of care expected to be maintained by a reasonably
> careful person under like circumstances.

In light of the foregoing, we find that the evidence presented was sufficient under the <u>Jackson</u> standard to support a conviction of second degree murder and, thus, a responsive verdict of manslaughter.[12]

Therefore, ample evidence of petitioner's guilt was introduced at trial, and so she would face a substantial challenge to establish a viable "actual innocence" claim. To do so, she would now have to present the Court with new evidence of her innocence – and that new evidence would have to be particularly compelling. Indeed, regarding the "actual innocence" exception, the United States Fifth Circuit Court of Appeals has explained:

> This exception's demanding standard requires evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error. The standard is seldom met.
> 
> An actual-innocence claim is only established when it is shown that, in the light of newly-discovered evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. Therefore, a credible claim must be supported by new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial. Actual innocence is then demonstrated only when the court scrutinizes the likely impact on reasonable jurors of the overall, newly supplemented record to conclude that, in the light of all evidence – both the evidence presented at trial and that newly discovered – no juror, acting reasonably, would have voted to find petitioner guilty beyond a reasonable doubt.

<u>Floyd v. Vannoy</u>, 894 F.3d 143, 154-55 (5th Cir. 2018) (citations, quotation marks, and brackets omitted). "Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." <u>Schlup</u>, 513 U.S. at 324.

---

[12] <u>Id.</u> at 502-06. As noted, the Louisiana Supreme Court then denied petitioner's related writ application challenging that judgment. <u>State ex rel. Otkins-Victor v. State</u>, 253 So. 3d 1294 (La. 2018).

Here, petitioner has not presented **any** new evidence whatsoever.  Accordingly, she has not met even "the threshold requirement" for Perkins to apply.  Perkins, 569 U.S. at 386.

Because petitioner is not entitled to statutory tolling, and because she has not established that she is eligible for equitable tolling or that she is actually innocent, her federal application for habeas corpus relief had to be filed no later than **January 14, 2020**, in order to be timely.  Because his application was filed no earlier than **March 3, 2021**,[13] it was untimely.

## RECOMMENDATION

It is therefore **RECOMMENDED** that petitioner's motion for a stay, Rec. Doc. 21, be **DENIED** and that her application for federal habeas corpus relief be **DISMISSED WITH PREJUDICE** as untimely.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this ___17th___ day of December, 2021.

 

**DANA M. DOUGLAS**
**UNITED STATES MAGISTRATE JUDGE**

---

[13] "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court."  Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003).  Petitioner states that she placed her federal application in the prison mail system on March 3, 2021.  Rec. Doc. 5, pp. 13 and 15; see also Rec. Doc. 5-1, p. 9